Good morning, Your Honor. It's Adam Axelrod here on behalf of Defendant and Appellant Chunchai Yu. This case involves one count of bribery and several counts of trafficking in counterfeit merchandise, that merchandise being exercise equipment. The first issue I'd like to address is the jury instruction issue. The court set forth the jury instructions and the four main elements, but there was no instruction that Ms. Yu herself had to know that the use of the counterfeit marks were likely to deceive. And this is plain error, right? No objection to the instruction? There was no objection to the instruction. It is a plain error standard. But I think that's a significant point because obviously in this particular case, the only real issue with respect to the guilt phase, at least the way I saw the record, is whether the requisite intent was there. And I cited the Western District of New York case, that Infernari that speaks to that issue. I could not find another which talked about it because it's hard to tell whether that element likely to cause confusion. It's hard to find another case that talks about it because the answer's pretty clear. Well, I wasn't able to find a case that said that this is not... Probably never been raised before. Here's somebody who goes to a great deal of trouble to simulate genuine equipment. And there's no doubt about the facts in this case, I don't think. They're pretty clear, aren't they? Well, I would agree that the facts are pretty clear. I'm not sure if we'd agree exactly on what they are. She definitely... Well, we may not agree on the consequences of the facts, as clear as they are, but a lot of effort was done to make what was counterfeit appear real. Well, I think that the evidence shows that she put these counterfeit marks that look like legitimate marks on the merchandise. But my other issue, in regard to the guilt phase, the sufficiency of the evidence issue, is that there was no evidence about the similarity between the actual merchandise, the counterfeit merchandise, and the authentic merchandise. And I think that's really a critical issue because if you look at the trafficking cases, they all discuss some purchaser's confusion, would-be purchaser's confusion, a government expert comes in and testifies that these items looked alike, and there's nothing in the record here about that. Did she put on a defense? Did she dispute that they were similar? I mean, what was her defense on this point? Well, she didn't give evidence disputing that, but that is not... the burden is on the government to prove that they are in fact similar. So she didn't give evidence disputing it, but the only evidence that the government put in the record that I could find was one agent's testimony about one item that looked similar, and that was it. There was, you know... Was it a para? Yes. He testified that the items looked similar to authentic products. Right, and that was just... I mean, that was literally the extent of his testimony. And the stipulation of the parties was that the counterfeit marks were substantially identical to the authentic products. Well, yes, and that refers to the marks. I'm not going to dispute that the marks, you know, if it was a Nike sluice stripe, looked like the Nike sluice stripe. That's not what we're talking about here, but... So the whole point of putting on marks that are confusingly similar is to pass off the accused merchandise for the authentic merchandise. Why else do it? Well, I mean, you know, I don't know exactly all the reasons. That's obviously one obvious reason, you know. Have any other reasons? Well, I'm not going to try to think up all the possibilities. I mean, people put, you know, fake items. You know, my three-year-old daughter used to go around with Chiquita banana stickers on her forehead, but I don't think she thought she was a banana. Right. There are other reasons. This is not a three-year-old girl. Not a three-year-old. But, I mean, there are items out there with fake emblems on them that are obviously not the real thing, and I don't think that it's always definitely intended to confuse. But let me just step back and say that the question, the evidence, there has to be at least evidence on the issue. I mean, the question is whether the government presented some evidence of that, because there's no doubt that there has to be evidence that they were likely, or, you know, she had reason to believe they were likely to confuse. And there just wasn't evidence on that they were similar in any way, except for that one agent's testimony. That's enough. I mean, you know what? I would disrespectfully disagree, Your Honor, in a case of this nature, and I say again when you say that. I would respectfully disagree, I think. You said, I would disrespectfully disagree. No. If I said that, I misspoke. But if you look at the trafficking cases, you know, for example, there was one cited by the government, you mean, and you can look at the evidence. There's always evidence about confusion that actual customers had, some other evidence about people that brought things into repair, or some expert who comes in and says, look, I examined what the defendant was selling. I examined the. . . I think the record shows here these people thought they were getting good bargains. Well, people did think that they were getting bargains, I suppose, because the prices that they were being sold for were less than the authentic items. So maybe there was no confusion at all, and that's what I'm pointing to. I mean, there should be some evidence of it. That's what the requirement is under the statute, and there just wasn't evidence of it. I'll move on to the sentencing issues. That also sort of plays in a little bit with this issue. But the main issue with regard to the guideline range would have been driven by the calculation of the loss and the calculation of the infringement amount. What surprised me was the amount, the number of dollars that were involved. Were you surprised? Was I surprised? You know, frankly, Your Honor, I don't do. . . I haven't seen a lot of. . . I personally don't do a lot of trafficking cases, so I'm not sure what's typical or not. This is amazing. Yeah. It was worth her while, the amount of money she was recovering for the counterfeit goods. I mean, I'm not sure. . . I don't know that. . . What kind of profits you. . . It's a big deal, and it's not going to turn the day, but I just was a little surprised at how much money was involved in this. I guess because maybe it's exercise equipment, it's larger items, but there's obviously a main dispute about whether the amount at issue, and that obviously drove the guideline range. I think if you look at 2B5.3 of the guidelines, it's pretty clear that the retail value shouldn't have been used, and that was the problem. The defense argued that the values of the items that she was selling were actually a lot less than the authentic retail value. There was also an issue about the quantity, because there was dumbbells that were counted as individual when they were sold in pairs, so that was like a double counting of that amount. But it's pretty clear that there was a lot of evidence that the retail value of what she was selling. . . Did your client object to the values? Yes. Was there a hearing? Yeah, well, this was part of the sentencing hearing. She objected in her brief to the court, and it was discussed at sentencing. But the court imposed the guideline range that corresponded with the retail values of the authentic items. And what value did you think was appropriate? The value that I . . . I mean, I'm looking at what the defense submission is, and I believe that the value would have been under the $400,000 level, which brought it . . . On what basis? Counting up the items and multiplying it by the true value of what they sold for, versus using the retail value. You mean the discounted value because they were knockoffs? Right. And that's actually what the guide . . . They were passed off as true merchandise, so the intent was to make it appear as if it was a discounted value off the real value. And the real value was what was, in effect, stolen. Well, I mean, Your Honor, if you take a look at the actual guideline, the particular guideline in the application notes, that's not . . . If it were as simple as that, it would just say you always use the retail value. But they're trying to really get to what the loss was. And I think . . . The value of the infringed items is to be used when the retail value of the infringing item is difficult or impossible to determine without unduly complicating or prolonging the sentencing proceeding. And if the defendant did not present alternative values or evidence of values, the district court was quite right to accept the retail value. Well, the defendant did, though. The defendant did present alternate values and an alternate calculation. I mean, the district court did not use that. But the defendant did, in fact, present that. And there was some pretty significant evidence showing that the value should not have been calculated based on . . . The infringement amount should not have been calculated based on the retail value of the authentic items. I don't think it's fair to say that in this case, that every time Ms. Yu sold one of these items, that the . . . The customer buying this accused merchandise would think that the customer is getting an equivalent of value on the retail level. I . . . That was the intent of the crime, to pass off merchandise as if they were real. Accordingly, the district court was correct in using the retail value as the determinant of the value of that which was stolen. Well, let me be . . . I just . . . I respectfully . . . Let me be . . . Not disrespectfully. I respectfully disagree with that. I just don't think that's true. It's not . . . If you look at . . . It's not the actual value. It's intent. Well . . . What the intention is. If you look at the guideline, it talks about trying to get to what the actual retail . . . what the loss was, what the infringement amount was. And it gives a whole bunch of factors. And if you plug those factors into this case, which I've done in the brief, I believe it's pretty clear that the retail value of the authentic items is not an appropriate value. It's not what these items actually sold for. It doesn't really represent truthfully the pecuniary loss to the authentic manufacturers. So I don't think it's fair to do that. Obviously, there's a loss, but the question is how much. And if she would have benefited from her valuation, which I think there's substantial evidence of, you're talking about a 10- to 12-month difference in the guideline range, and that's significant. Now, one of the bases under the guideline for using the retail value is the retail value is to be used if the infringing item appears to be identical or substantially equivalent to the infringed item. Right. What's the standard of which we would review a district judge's determination that the retail price is the price to be considered based on that criterion? Because it seems to me there's enough evidence in the record from which the district judge could have concluded that. I mean, these are knockoffs. We have the stipulation. We have the mark on top of it. I mean, they're designed to deceive. They're designed to have someone who's the purchaser figuring, hey, I'm getting this really good deal, da-da-da. But, Your Honor, that would send me back to the discussion about where is the government's evidence. I understand that. But so my question is how much evidence does the district judge need to have and what's the standard on which we review what the district judge decided based on that evidence? Well, I mean, these are going to be guesses on my part, but I would guess it's a preponderance. And I would guess it's probably abuse of discretion. There are layers here, you see, that I can't get at that as if I were the district judge. And you get clear error? I don't know if it's clear error because she definitely raised this objection. She definitely argued that these retail values were. . . No, but the district court has found by a preponderance of the evidence what the value was. So what's our standard for review? Is it clear error? The district court must have made clear error? On a question of fact, that is, clean error is different from clear error. Are you with me? Yes. I think the problem is the district court, we don't know why the district court. . . I mean, I'm looking at that. . . This was not some simple, let's do it. China was making the products. She was a distributor. And so when you talk about how it competes with the people who purchased this would have purchased, it can be argued, the authentic equipment. Well, here's . . . We thought they were. I think the problem that I . . . where I differ with your honor and the problem that I have with this case is that there really isn't any . . . You differ with me because you represent the person who was doing the dirt and we've got to decide the case, and that puts us in pretty different positions. Well, that's . . . And detrimental to the makers of authentic equipment, don't you think? Well, any time there's counterfeiting going on, it's detrimental. I mean, I wouldn't disagree with that, but what I'm talking about is when you read the counterfeit cases, there is always much more evidence than existed in this case about the similarities between the product that was counterfeit and the legitimate product. And usually that comes in because somebody objects. Mr. Axelrod . . . Yes. The guidelines were used as they were used, and then the district judge imposed a 3553A consideration. Right. And notwithstanding the severity of the crime and the people that were injured imposed a below-guideline sentence. Right. Doesn't that make your argument move? I don't think it makes it move because when you look at how district judges impose . . . calculate the guidelines . . . Well, the judge did . . . Correctly. . . . and then imposed a 3553A consideration . . . Well . . . . . . and went below the guidelines. I guess I'm arguing that he did not use that provision 2B5.3 of the guidelines correctly. He used the retail value of the authentic items. So he did go below the guidelines, but I think judges use that guideline range as a real gravitational pull. And even though he ultimately chose to go below the guidelines, had he calculated a guideline range that was 10 months lower, he may have sentenced Ms. Yu to a sentence that was 10 months lower. Okay. You're over time. Let's hear from the government, but we'll let you respond. Can I just make one more point? It's real quick. Just to say on the sentencing issue that I know this court is probably not at all . . . I know that it gives a wide latitude of discretion to district courts in sentencing, but, I mean, I think there's something to be said for these cases where the defendant has no criminal history whatsoever, and they could probably, when you look at them, be sentenced to a year and really get the adequate punishment and learn their lesson. Ms. Yu had some pretty serious family circumstances that made her case unique. Thank you. Good morning, Your Honors. My name is Eric Vanderveldt for the United States. And may it please the Court. With respect to the jury instruction issue, this issue should be deemed waived. But even if, Your Honors, go beyond the waiver issue, the jury was properly instructed. The jury was instructed that the government needed to prove that the defendant knowingly used a counterfeit mark. And counterfeit mark was given . . . the instruction was provided to the jury that defined that term as it's defined directly in the statute under 2320E1A. So the jury instructions as given came directly from the statute. They're supported by the legislative history that sets forth the mens rea requirement. And the jury does not need to be instructed as to the extra element that Infernari instructed the jury on, which is that defendant know that there was a likelihood of confusion. As to the sufficiency, I want to address a point the defense counsel has repeatedly stated, that the only evidence in the record was this one statement by the case agent. That's just simply not the case. There was a stipulation. The reason other cases may have evidence of experts or consumers who testifies to confusion is because those cases may not have had a stipulation. In this case, defendant stipulated that her goods were counterfeit. By stipulating that they bore counterfeit marks, counterfeit marks was defined as something that was likely to cause confusion. So in this case, defendant stipulated to that. Her defense at trial was not that her goods were authentic. Her defense at trial was that she didn't know that they were counterfeit. And so if you take a look at the stipulation, that alone provides sufficient evidence to find that there was a likelihood of confusion. Even putting that aside, though, there's other evidence in the record. There were photographs of the counterfeit goods. The real marks at issue were put into the record. There was a stipulation that associated each type of counterfeit good with its corresponding authentic good. And then defendant's own testimony was sufficient to find confusion. Defendant testified that her customers would purchase counterfeit goods from her, but when they wanted a replacement part, they wouldn't go to defendant. They would actually contact the real manufacturer, the original equipment manufacturer, OEM. So the fact that her own customers, when they need something to fix on their equipment, are reaching out to the OEM as opposed to defendant, shows that they were confused as to the origin of these products and whether they were counterfeit or not. And in fact, defendant herself sent an email to her supplier of counterfeit goods in China that says we need to move these goods quickly before the OEMs give us problems, which shows that she knows exactly what she's doing, that there's likely confusion in the marketplace between her counterfeit goods and the authentic goods. And so when you apply Neville's, the sufficiency standard in this case, and you draw all inferences in favor of the verdict, there's ample evidence in the record of a likelihood of confusion. Now, turning to the infringement amount at sentencing, I want to make clear what defendant's objection was. It was not that she wanted to use the value of her infringing counterfeit goods. Defendant herself proposed using the value of the authentic goods. Now, she had a different quantity, which affected the dollar amount, and she had a few different prices, which would affect the total dollar amount. But she herself advocated for the very approach that the district court followed, and that is to use the value of the authentic goods. Now, before trial, the parties had stipulated that that total amount was roughly $580,000. At sentencing, she attempted to challenge the quantity and she attempted to challenge a few prices as to the value of the authentic items. But she never advocated that the district court use the value of the counterfeit goods. And so the district court did not err by applying 2B5.3, application note 2, and following what defendant herself advocated for, what the probation department recommended, and what the government followed. And so finding that the value of the authentic goods should be used, they correctly calculated the guideline range for the defendant. And then I'll just briefly touch upon the 3553 factors. This was an egregious case of counterfeiting, and on top of that, you have bribery. Part of what drove this prosecution was the fact that when her goods were detained in the summer of 2009, she reached out to a customs official and attempted to pay a $12,000 cash bribe for the release of her goods. And then when those goods were delivered in a sting operation and she was confronted about her counterfeit goods and not arrested and told that what she was doing was illegal, told that her goods were counterfeit, she persisted in doing it. After that controlled delivery, she changed her tactics. She actually began importing unmarked goods via ocean freight and these stickers and DVDs and instruction manuals to be used with those goods separately via air freight, which shows it's a window into her state of mind as to what she was doing. And so a below-guideline sentence of 41 months was not unreasonable in this case. And then finally, although it wasn't raised, the community service challenge to the condition of community service I think is foreclosed by DAGA. It goes towards rehabilitation. The guidelines themselves indicate that community service is appropriate and the district court is not required to provide a lengthy explanation as to why it imposed a condition of community service. And unless your honors have further questions, I'll submit. Thank you. One minute. With respect to the stipulation, I think the stipulation, you can read it. It's in the record. It's pretty clear. It doesn't talk about the actual merchandise itself. Misuse stipulates that she used counterfeit marks on them, but it doesn't talk at all about their similarity to the authentic items. So I don't think the stipulation really gets us anywhere. There's no evidence about how the items themselves are similar. As far as her advocating for the use of the retail value, I mean, I don't know where that exists in the record. I know with respect to her sentencing memorandum, it specifically argued that those prices, the retail prices, were inaccurate. So she may have not specifically said that, you know, you have to use the prices for the counterfeit items, but that's essentially what she was saying because she was saying that the retail values aren't correct, of the authentic items aren't a correct way to value loss. And I didn't bring it up, but I would just say with respect to the supervised release condition, that the district court is still obligated to affirmatively make some sort of determination that it's narrowly tailored and connected to the basis for the case. And unlike Vega, there's nothing in this record at all, first of all, that the court did that, or that there was a real basis for it. Thank you. Thank you. Thank both sides for your arguments. The United States v. U. of Tenshai is now submitted for decision.
judges: Hellerstein, Farris, Fletcher